UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

| | |
|---|---|
| RICK CAMPBELL, ) | |
|     Plaintiff, ) | |
| ) | |
| vs. ) | 3:09-cv-68-RLY-WGH |
| ) | |
| KENNY KENT CHEVROLET ) | |
| COMPANY, INC., EVANSVILLE ) | |
| AUTOMOTIVE LLC, and VT, INC., ) | |
|     Defendants. ) | |

**ENTRY ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiff, Rick Campbell ("Plaintiff"), is the former general manager of Kenny Kent Chevrolet Company, Inc. and Kenny Kent Hyundai ("Kenny Kent"). Plaintiff alleges that he was terminated in retaliation for refusing to follow his boss's (Doug Hennier) ("Hennier") orders to terminate a Kenny Kent saleswoman who rebuffed Hennier's sexual advances, and for reporting the same. For the reasons set forth below, the court **DENIES** Kenny Kent's motion.

**I.**  **Background**

The defendants in this case, Kenny Kent, Evansville Automotive LLC, and VT, Inc., are referred to generically in the Complaint as "Defendants." From a review of the record, it appears that defendant, Evansville Automotive LLC, is more properly known as Evansville Automotive (HYU) a/k/a Kenny Kent Hyundai, and that defendant, VT, Inc. ("VT"), owns both Kenny Kent dealerships (among many others in the United States)

1

(collectively "Defendants"). There is also a separate entity not named as a defendant known as the Van Tuyl Group, Inc., which provides management consulting to VT, Inc.'s car dealerships. (*See* Affidavit of James Thayer ("Thayer Aff.") ¶ 4). It is the court's understanding that VT and the Van Tuyl Group are owned by Cecil and Larry Van Tuyl. (Deposition of Rick Campbell ("Plaintiff Dep.") at 24) (testifying that Cecil and Larry Van Tuyl owned the largest privately held auto group in the country).

### A. Plaintiff's Employment

On February 28, 2007, Larry Van Tuyl hired Plaintiff as General Manager of Kenny Kent. (*Id*. at 30). At all times, Plaintiff was an employee of and paid by Kenny Kent. (*Id*. at 47-48). Plaintiff's direct superior was Hennier. Hennier was the head of Auditing for VT, and, at that particular time, also oversaw the Kenny Kent dealerships. (*Id*. at 28-29).

Soon after Plaintiff was hired as General Manager, Hennier hired George Clark ("Clark") as Controller for Kenny Kent. (Deposition of George Clark ("Clark Dep.") at 16, 19). Both Plaintiff and Clark were hired to revive Kenny Kent, whose sales and profits had slipped significantly in the past couple of years, (*id*. at 19), and whose general ledgers were fraught with accounting errors (*id*. at 29-30).

### B. Sexual Harassment Policy and Allegations

Kenny Kent has a sexual harassment policy, which generally requires a Kenny Kent employee, who believes he/she has been the victim of harassment, to report the incident to "your Manager or to any other Manager with the Dealership or to the General

2

Manager as soon as possible." (Plaintiff Dep. Ex. 3). If, for any reason the employee does not wish to report an incident to a Manager, "you should call the **Employee Hot Line 1-800-435-5858**." (*Id.*). The Employee Hot Line is administered by a third party human resources consulting company known as Auto HR. (Plaintiff Dep. Ex. 17).

In June 2007, Plaintiff learned of a relationship between Hennier and one of Plaintiff's salespersons, Haley Maravich ("Maravich"). (Plaintiff Dep. at 66-67). Shortly thereafter, Hennier contacted Plaintiff and instructed him to take care of his "liabilities." (*Id.* at 67, 72, 93, 124). Plaintiff misunderstood Hennier's request, and informed him of the actions he was taking to improve the dealership. (*Id.* at 71-72). Hennier responded, "I'm not talking about those liabilities; I'm talking about the girl." (*Id.* at 72). Plaintiff told Hennier that Maravich was not his liability, she was Hennier's liability. (*Id.*). Hennier reiterated that Plaintiff needed to get rid of his responsibilities, i.e., Maravich, and walked out. (*Id.*). At that time, Plaintiff did not report his conversation with Hennier to anyone. (*Id.* at 73).

On June 20, 2007, Maravich met with Plaintiff to discuss her job performance. (*Id.* at 75). Maravich explained to Plaintiff why her sales had dropped off and revealed her relationship with Hennier. (*Id.* at 78-79). Maravich informed Plaintiff that Hennier asked her out numerous times, and that they had a one time sexual encounter. (*Id.* at 80-81). Hennier continued to contact Maravich, and wanted to see her every time he was in town. (*Id.* at 81). Plaintiff asked Maravich what she wanted him to do about the situation, and she responded that she did not want him to do anything, as she wanted to

3

discuss the matter with her father and brother first. (*Id*. at 88). Following this meeting, Plaintiff told Clark about the Hennier and Maravich situation, but no one else. (*Id*. at 86-88).

The day after his meeting with Maravich, Plaintiff informed Hennier by telephone that Maravich was not a "liability" and that he would not discipline or fire her. (*Id*. at 82). Hennier responded by saying, "suit yourself" and proceeded to hang up the telephone. (*Id*.).

### C. Plaintiff's Performance and Alleged Retaliation

Plaintiff and Clark worked together on a daily basis to improve Kenny Kent's car sales. (Clark Dep. at 39). Plaintiff maintains that from March to July 2007, Kenny Kent lost $185,000, which was a significant improvement over the loss statement for the last three months of 2006. (*Id*. at 152). According to Clark, by the time Plaintiff was terminated in early September 2007, Kenny Kent was doing very well compared to similar dealerships in the local market over the same time period. (*Id*. at 79-82). In fact, prior to July 2007, Plaintiff was praised for his work at Kenny Kent by Hennier, Thayer, Cecil and Larry Van Tuyl. (Plaintiff Dep. at 55). In a June 18, 2007, email from Hennier to Plaintiff, Hennier recognized that Plaintiff brought "stability, professionalism and organization to the dealership," and that Clark "impresses me every time I meet with him." (Plaintiff Dep. Ex. 20). In addition, prior to July 2007, Plaintiff heard from Hennier by phone almost every day. (Plaintiff Dep. at 102).

By July 2007, the relationship between Plaintiff and the Defendants changed. For

example, Hennier dropped off almost all communication with Plaintiff. (Plaintiff Dep. at 102). Clark also testified that by July 2007, his communication with Hennier dropped to "nearly nothing." (Clark Dep. at 49). At Van Tuyl's July 2007 quarterly meeting, Hennier ignored Plaintiff. (Plaintiff Dep. at 57-58). Plaintiff thought Hennier's avoidance was significant because at the last quarterly meeting in April, Hennier told Plaintiff that after he decided to terminate Kenny Kent's previous General Manager, he "just quit talking to him." (*Id*. at 57).

By July 1, 2007, James Thayer ("Thayer"), Chief Financial Officer of Van Tuyl Group, testified that Plaintiff's performance in terms of cars sold and profits was significantly worse than the terminated general manager he replaced. (Thayer Aff. ¶ 10; *see also* Thayer Aff. Exs. B, C). One of the reasons that Kenny Kent's car sales and profits did not appear to be improving is because, according to Clark, Hennier directed him to absorb losses that should have been accounted for before Plaintiff took over. (Clark Dep. at 17-18, 37-39). At any rate, Thayer maintains that, at that time, he made the decision to interview applicants to replace both Plaintiff and Clark. (Thayer Aff. ¶ 12).

In addition, Hennier ordered a 10-day audit of Kenny Kent. (Plaintiff Dep. at 94). According to Plaintiff, there was no need for this audit because Kenny Kent had "just been through an extensive audit [in May] trying to clean up the books from previous management the last two or three years." (*Id*.). The final audit from May adjusted several months where Plaintiff and Clark thought they had made profits. (*Id*. at 98). The

5

adjustment did not concern Plaintiff at that time, because, according to his employment contract, his salary was not tied to profits until September 2007. (*Id*.; Plaintiff Dep. Ex. 2).

In August 2007, Plaintiff planned for a used car sale and spent approximately $75,000 marketing the event. (Clark Dep. at 52; Plaintiff Dep. at 116). Kent Montgomery ("Montgomery"), the Director of Pre-Owned Operations of Van Tuyl Group, called Plaintiff and told him that Larry Van Tuyl, after having discussed the situation with Hennier, instructed Montgomery to take up to 80 cars off Kenny Kent's lots to sell them at auction in Dallas, Texas. (Plaintiff Dep. at 115; Affidavit of Kent Montgomery ¶¶ 11-12). Clark could think of no legitimate business reason to sell the used car inventory before the used car sale, as the dealership had invested large sums of money in marketing and promotion. (Clark Dep. at 54-55, 143-44). Plaintiff testified that Defendants' action "destroyed the morale of all the salespeople [and] the service people . . . ." (Plaintiff Dep. at 118). This action also "negatively impacted the August financial statement hugely." (Clark Dep. at 52-53). Making matters worse, Hennier sent an email to Plaintiff criticizing him for the "write down" of Kenny Kent's inventory for August 2007. (*Id*. at 86).

Also in August 2007, a man named "Javier," an auditor from VT, informed Plaintiff that cars could not be sold until Kenny Kent had actual possession of title. (*Id*. at 94-99). This policy change did not affect any of the Defendants' other dealerships. (*Id*.). On August 20, 2007, Plaintiff emailed Hennier, Thayer, and Larry Van Tuyl, asking that

the policy be changed, because in Indiana, Kenny Kent may have to wait up to thirty days before it received the requisite legal title. (Plaintiff Dep. Ex. 14). Plaintiff explained that "[w]ith the current write down policy, this has made it difficult to sale [sic] a vehicle with in [sic] the write down time frame." (*Id.*). Hennier did not agree to change the policy. (Clark Dep. at 98).

### D. Plaintiff Reports the Harassment

On August 2, 2007, Plaintiff and Clark reported Hennier's alleged sexual harassment of Maravich, and Hennier's response, to Dan Charpie ("Charpie"), Head of Risk Management for VT. (Plaintiff Dep. at 105-06, 112, 124). Charpie told Plaintiff and Clark to call Auto HR or discuss the matter with Thayer. (*Id.* at 105).

On August 27, 2007, Plaintiff left a message with Auto HR reporting the relationship between Maravich and Hennier. (*Id.* at 155-56; Plaintiff Dep. Ex. 18). Plaintiff also reported that since he refused Hennier's request to fire Maravich, Hennier has treated him differently and, in his opinion, intentionally tried to undermine him and his performance by "holding money back so that it will look like we are not doing as well." (Plaintiff Dep. Ex. 18). Two days later, Plaintiff again contacted Auto HR and personally spoke with a representative, noting his concern that he had not heard from anyone regarding his complaint. (Plaintiff Dep. Ex. 19). Plaintiff reported the fact that he had a copy of the text messaging records between Maravich and Hennier. (Clark Dep at 103; Plaintiff Dep. Ex. 19). The Auto HR representative asked Plaintiff to email or fax a copy of Maravich's records regarding her complaint to Auto HR. (Clark Dep. Ex. 19).

Plaintiff stated he would rather just hold on to them. (*Id.*).

On August 31, 2007, Thayer flew in and met with Plaintiff. (Plaintiff Dep. at 129-31). Thayer confirmed that he was aware of Maravich's sexual harassment complaint, and asked what could be done to resolve the situation between Maravich and Hennier. (*Id.* at 130). Plaintiff suggested that Thayer compensate Maravich for Hennier's treatment of her, that his salespersons be compensated for the money they did not earn as a result of the Defendants' decision to move the used car inventory to Dallas for auction, and that he be able to run his store free from Hennier's interference. (*Id.* at 130-31). Thayer responded, "that's not going to happen. We've never settled with anybody and we're never going to." (*Id.*).

### E. Plaintiff's Termination

On September 5, 2007, Maravich presented to Plaintiff and Clark her formal, handwritten complaint of sexual harassment. (*Id.* at 134-35, 138; Plaintiff Dep. Ex. 21). Plaintiff and Clark forwarded the complaint via email to Charpie, Thayer, James Delwyn, and Larry Van Tuyl. (Plaintiff Dep. at 138).

The following day, Thayer traveled to Evansville to meet with Plaintiff between 6:30 p.m. and 7:00 p.m.. (Thayer Aff. ¶ 18; Plaintiff Dep. at 141). Thayer asked Plaintiff to produce the text message records that Maravich gave Plaintiff. (Plaintiff Dep. at 140). Plaintiff told Thayer that he did not have the records at the store but that they were at his home. (*Id.*). Thayer then asked Plaintiff to go home to get the records. (*Id.*). Plaintiff said he lived approximately an hour away from the dealership and would be happy to

bring them in the morning. (*Id*.). Thayer asked him again to get the records, and Plaintiff refused. (*Id*. at 141; Thayer Aff. ¶ 21). Thayer then terminated Plaintiff's employment. (Plaintiff Dep. at 141; Thayer Aff. ¶ 22).

That same day, Thayer terminated Clark. (Clark Dep. at 129). Clark testified that Thayer told him that he fired Plaintiff for insubordination, and that he was "going to let me go, as well, because they felt like I was too close to [Plaintiff], but, comma, they would say it was for performance reasons." (*Id*.).

Prior to their respective terminations, neither Plaintiff nor Clark had received any warning or progressive discipline. (Plaintiff Dep. at 149-50; Clark Dep. at 129).

## II. Summary Judgment Standard

Summary judgment is proper only if the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the burden of informing the court of the basis for its motion and demonstrating the "absence of evidence on an essential element of the non-moving party's case," *Celotex Corp*., 477 U.S. at 323, 325. To withstand a motion for summary judgment, the nonmoving party may not simply rest on the pleadings, but rather must "make a showing sufficient to establish the existence of [the] element[s] essential to that party's case, and on which that party will bear the burden of proof at trial. . .". *Id*. at 322. If the non-moving party fails to make this showing, then the moving party is entitled to judgment as a matter of law. *Id*. at 323.

In determining whether a genuine issue of material fact exists, the court must view the record and all reasonable inferences in the light most favorable to the non-moving party. *See Nat'l Soffit & Escutcheons, Inc. v. Superior Sys., Inc.*, 98 F.3d 262, 264 (7th Cir. 1996). No genuine issue exists if the record viewed as a whole could not lead a rational trier of fact to find for the non-moving party. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Ritchie v. Glidden Co.*, 242 F.3d 713, 720 (7th Cir. 2001).

**III. Discussion**

Plaintiff alleges that the Defendants retaliated against him for his complaints of sexual harassment. Plaintiff proceeds under the direct method. Thus, Plaintiff must establish that: (1) he engaged in statutorily protected expression; (2) he suffered an adverse employment action; and (3) there is a causal link between the protected expression and the adverse action. *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 686 (7th Cir. 2008); *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 792 (7th Cir. 2007). The direct method allows a plaintiff to present circumstantial evidence of intentional retaliation, "including evidence of suspicious timing, ambiguous statements, behavior toward or comments directed at the other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent may be drawn." *Boumehdi*, 489 F.3d at 792 (citing *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994)).

It is undisputed that Plaintiff engaged in protected activity by (1) reporting the

alleged harassment of Maravich by Hennier to Charpie and Auto HR, and arguably, by (2) refusing to terminate Maravich at Hennier's request.  It is also undisputed that Plaintiff's termination constitutes an adverse employment action.  Thus, the element at issue here is (3) above – i.e., whether there is a causal link between Plaintiff's protected expression and Plaintiff's termination.

The evidence viewed in the light most favorable to the Plaintiff reflects that prior to July 2007,  Plaintiff was performing his position as General Manager of Kenny Kent to his employer's legitimate expectations.  Plaintiff testified that he was on the verge of turning Kenny Kent's sales and profits around, and that he received praise not only from Hennier, but also from Hennier's boss, Thayer, and the Van Tuyls.  After his refusal to terminate Maravich, their treatment of Plaintiff and his right-hand man, Clark, changed.  Both Plaintiff and Clark consistently testified that Hennier began to ignore them, ordered an unnecessary ten-day audit, interfered with their used car promotion, and changed Kenny Kent's policy with respect to the transfer of title to vehicles on its lots, all of which significantly affected Kenny Kent's bottom line.

Of course, in order to establish a claim of retaliation, Plaintiff must establish that Thayer had knowledge of Plaintiff's protected activity, and that a causal link exists between Plaintiff's protected activity and Thayer's decision to terminate him.  *See Luckie v. Ameritech Corp.*, 389 F.3d 708, 715 (7th Cir. 2004) ("It is not sufficient that [an employer] *could* or even *should* have known about [an employee's] complaint; [the employer] must have actual knowledge of the complaints for [its] decisions to be

retaliatory.") (emphasis in original). In other words, Plaintiff cannot rely solely on Hennier's actions to establish his claim of retaliation.

The evidence, again viewed in the light most favorable to Plaintiff, suggests that Thayer made the decision to terminate Plaintiff well before his September 6, 2007, termination. In fact, Thayer testified that he made the decision by July 1, 2007 – a date approximately two weeks after Plaintiff refused Hennier's order to terminate Maravich. Although Thayer testified that, at that time, he was unaware of their affair, and that Hennier played no part in that decision, (Thayer Aff. ¶ 12), the record reflects that he acquired knowledge of the affair and the fact that Maravich's text messaging records were in Plaintiff's possession. The record does not explain how he became aware of these facts, but a reasonable juror could disbelieve Thayer and infer that he became aware of these facts either from Hennier or Charpie, Thayer's employees.

Moreover, Plaintiff was not told that he was being terminated for poor performance during his meeting with Thayer. In fact, he had never been told that his performance was deficient. Curiously, Clark, who likewise never received a poor performance review, was terminated on the same day, not for performance issues, but because he was "too close" to Plaintiff.

Thayer's asserted reason for Plaintiff's termination – insubordination – is also suspect. A reasonable juror could conclude that Plaintiff, who was discussing Maravich's complaint of sexual harassment with Thayer, did not refuse to provide the text messages requested by Thayer, but simply asked to return them the next morning, as the meeting

12

occurred after the close of business and a two-hour drive was required to retrieve them at that moment. Thus, a reasonable juror could conclude that the decision to terminate Plaintiff had been made before the meeting of September 6, 2007, and that the failure of Plaintiff to "immediately" retrieve the text message records did not "cause" his termination.  Indeed, a reasonable jury could infer that Plaintiff's request to provide the materials the next morning is not the type of "insubordination" that should reasonably have resulted in termination.

Finally, Thayer's other asserted reason for Plaintiff's termination – that he failed to follow Kenny Kent's sexual harassment policy and mismanaged Maravich's complaint – is also suspect.  Maravich told Plaintiff not to report the harassment because she wanted to discuss her options with members of her family.  Moreover, Plaintiff did report the harassment to Charpie, who simply said to call Auto HR.  Although Plaintiff did not promptly call Auto HR, a reasonable juror could conclude that his inaction was understandable, given the peculiar circumstances he was in, and the alleged treatment he was receiving from his superiors.

Because the combination of suspicious timing and other bits and pieces of circumstantial evidence creates a mosaic from which a reasonable jury could conclude retaliatory motive on the part of Thayer, Defendants' motion for summary judgment on Plaintiff's retaliation claim must be **DENIED**.

## IV. Conclusion

The court finds a genuine issue of fact exists as to whether Thayer's decision to

terminate Plaintiff was tinged with retaliatory animus. Accordingly, Defendants' Motion for Summary Judgment (Docket # 68) is **DENIED**.

**SO ORDERED** this 18th day of May 2011.

_____
RICHARD L. YOUNG, CHIEF JUDGE
United States District Court
Southern District of Indiana

Electronic Copies to:

Kyle Frederick Biesecker
BIESECKER DUTKANYCH & MACER, LLC
kfb@bdlegal.com

Matthew T. Black
LAW OFFICES, THE CINCINNATI INSURANCE COMPANY
matthew.black@atg.in.gov

Andrew Dutkanych III
BIESECKER DUTKANYCH & MACER LLC
ad@bdlegal.com

Alan L. McLaughlin
LITTLER MENDELSON PC
amclaughlin@littler.com

Lane C. Siesky
SIESKY LAW FIRM, PC
lane@sieskylaw.com